Caleb MORPHIS, Defendant–Appellant,

v.

UNITED STATES of America, Plaintiff–Appellee.

No. 03–5459.

United States Court of Appeals, Sixth Circuit.

Aug. 31, 2004.

William Cohen, Asst. U.S. Attorney, U.S. Attorney's Office, Nashville, TN, for Plaintiff–Appellee.

C. Douglas Thoresen, Asst. F.P. Defender, Federal Public Defender's Office, Nashville, TN, for Defendant–Appellant.

Before KEITH and CLAY, Circuit Judges; and O'MEARA, District Judge.*

OMEARA, District Judge.

When he entered a guilty plea to a charge of manufacturing counterfeit money, defendant-appellant Caleb Morphis reserved his right to appeal the denial of his motion to suppress evidence based on the search of his bedroom. The district court found that Appellant's father consented to the warrantless search of the house, including Appellant's bedroom. For the rea-

* The Honorable John Corbett O'Meara, United States District Court for the Eastern District of Michigan, sitting by designation.

sons that follow, we will affirm the district court's denial of the motion to suppress evidence.

## I. BACKGROUND

Law enforcement officers from the Goodlettsville, Tennessee Police Department arrested Daniel Monroe and Zachary Morphis for attempting to pass counterfeit currency at a convenience store September 30, 2001. The two subsequently implicated Zachary Morphis' younger brother, appellant Caleb Morphis, who lived at home with his parents.

At approximately 4:30 a.m. on October 1, 2001, three law enforcement officers arrived at the Morphises' home in Millersville: Agent Jeffrey Kling of the United States Secret Service, Officer Mitch Ferguson from the Goodlettsville Police Department, and a police officer from the Millersville Police Department. The two officers were dressed in uniform; the agent was dressed in street clothes. All three were armed.

The officers called the residence from a telephone inside a marked police car. Richard Morphis, Caleb and Zachary's father, answered the call and confirmed that Caleb lived at home and was inside. Richard Morphis then went outside to talk to the officers. Agent Kling informed him that Zachary had been detained for passing counterfeit currency and that Caleb might have some knowledge about the counterfeit bills. Agent Kling asked Richard Morphis for permission to enter the house. Although he did not inform Richard Morphis of his right to refuse consent to enter, Agent Kling told him that if he were to refuse entrance, the officers would get a court order allowing them to enter. Richard Morphis allowed Agent Kling and the two officers to go inside the home, stating that he permitted the entry because he "is a law-abiding citizen."

Once inside the home, the three proceeded down a hallway to Caleb's bedroom where he was sleeping. Without knocking on the door or asking permission to enter the room, they turned on the bedroom light and entered the room. Richard Morphis remained in the doorway to the bedroom.

One of the officers awakened Caleb, and Agent Kling asked him where the counterfeit money was located. Agent Kling told Caleb that Daniel Monroe had informed them that Caleb had the counterfeit bills and a quantity of marijuana concealed beneath the rug in the bedroom. Caleb initially denied that he had any counterfeit money; however, Agent Kling informed him that they would rip up the rugs to locate the counterfeit bills. Caleb then looked at his father, who instructed him to "give it [the currency] to them."

Caleb then told Agent Kling that the currency was in the pocket of his pants, which were on the floor next to the bed. Agent Kling retrieved the pans, took out a wallet, and removed a ten dollar bill, which he recognized as counterfeit. One of the officers read Caleb his *Miranda* rights and placed him under arrest. He was handcuffed, placed in a police cruiser, and take to the Millersville police station. He was subsequently charged with counterfeiting.

Appellant Caleb Morphis filed this appeal of the district court's denial of his motion to suppress evidence. Appellant contends that the search and seizure was conducted in violation of the Fourth Amendment and that the orders given by officers constituted an unwarranted restraint on his liberty, rendering the search and seizure invalid under the Fourth Amendment. Thus, Appellant argues, all the evidence obtained and statements made as a result of the unlawful search and seizure should have been suppressed.

## II. STANDARD OF REVIEW

A district court's findings of fact will not be set aside unless they are clearly erroneous. *United States v. Loney,* 331 F.3d 516, 520 (6th Cir.2003). Findings of fact anchored in credibility assessments of the witnesses observed at the suppression hearing are generally not subject to reversal upon appellate review. *United States v. Ivy,* 165 F.3d 397, 401–02 (6th Cir.1998).

A district court's determination whether a search survives constitutional scrutiny as a matter of law is subject to *de novo* review. *United States v. Loney,* 331 F.3d at 520. However, this court has repeatedly held that the district court's findings concerning the voluntariness of a consent to search will not be reversed unless clearly erroneous. *United States v. Salvo,* 133 F.3d 943, 948 (6th Cir.1998); *United States v. Taylor,* 956 F.2d 572, 577 (6th Cir.1992); *United States v. Rose,* 889 F.2d 1490, 1494 (6th Cir.1989). When, as here, the district court has denied a motion to suppress, an appellate court reviews all evidence in a light most favorable to the government. *United States v. Galloway,* 316 F.3d 624, 628 (6th Cir.2003).

## III. ANALYSIS

This court has determined that Fourth Amendment rights "are personal rights that, like some other constitutional rights, may not be vicariously asserted." *United States v. Hopper,* 58 Fed.Appx. 619, 624 (6th Cir.2003). In this case the evidence Appellant seeks to suppress came from the search of his wallet, not from a general search of his father's home. Therefore, Appellant cannot vicariously challenge the validity of his father's consent to permit law enforcement officers to enter his home.

An individual may consent to a search of his person, premises, or effects; and such consent to search is valid if it is voluntarily given. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In determining whether consent was voluntarily given, a court must examine the totality of the circumstances. *Id.; United States v. Guimond,* 116 F.3d 166, 170 (6th Cir.1997). Among the factors to be considered in the totality of the circumstances analysis are the defendant's age, his or her education and intelligence, the existence of advice concerning the nature of the constitutional right that is implicated, the length of detention prior to the request for consent, the nature of any prior questioning, and whether any physical punishment was involved. *Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041. The absence of an overt act or threat of force, promises made to a defendant, or indications of more subtle forms of coercion that might flaw a defendant's judgment indicate that a defendant's consent was freely given. *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). A law enforcement officer's statements "to the effect that he would obtain a warrant if [a defendant does] not consent to the search does not taint [a defendant's] consent to search" unless the statements "were baseless or a pretext to coerce [the defendant]." *United States v. Salvo,* 133 F.3d at 954–55 (citations omitted).

The burden of establishing that consent was voluntarily given is on the government. *Schneckloth,* 412 U.S. at 222, 93 S.Ct. 2041. A defendant's knowledge of his "right to refuse consent is a factor, but the government need not prove that the defendant had such knowledge to establish that consent was voluntary." *United States v. Erwin,* 155 F.3d 818, 823 (6th Cir.1998); *accord Schneckloth,* 412 U.S. at 227. In "determining the scope of consent given, the court looks to what a reasonable person would understand from the exchange between the officer and the sus-

pect." *United States v. Dishman*, 12 Fed. Appx. 289, 292 (6th Cir.2001) (citation omitted).

█ Based upon the totality of the circumstances, it is clear that Agent Kling obtained valid consent to enter the Morphis home and to look in Caleb's wallet. At the time he and the other officers went to the residence, the agent was following the logical trail set forth by his interviews of Daniel Monroe and Zachary Morphis. Agent Kling asked for and received Richard Morphis' consent to enter his home. After being awakened, Caleb was advised of who Kling was and why he was there. Kling asked for and received Caleb's permission to look in his wallet. Upon discovery of the pattern note and other counterfeit money, Caleb was advised of his *Miranda* rights and signed a waiver of those rights prior to giving a detailed confession.

Although he was only eighteen years old at the time of the search, Caleb was no stranger to law enforcement, having been recently arrested for violations of his probation. There has been no evidence showing that he was uneducated, of limited intelligence, or that upon being awakened, he was unaware of who the officers were or what they were asking him. There is no credible evidence of any threats of physical force, coercion, or duress applied to obtain consent either to enter the house or to search Caleb's wallet. Thus, the district court's finding that consent was voluntarily given by both Richard and Caleb Morphis is not clearly erroneous.

Appellant Caleb Morphis has also claimed that the search of his wallet and seizure of its contents were unconstitutional because he was restrained and detained without probable cause. He alleges the officers told him not to move, and the officers demanded to see the counterfeit money. He also claims that the officers

engaged in a full blown search of his bedroom.

█ During the suppression hearing, Richard Morphis testified that upon entering his son's room, the officers instructed Caleb "not to move. To, you know, stay still." R. Morphis Tr. at 55. He also testified that the officers then permitted Caleb to sit up. *Id.* Neither Agent Kling nor Caleb testified to such an instruction, and Judge Echols made no finding that such an instruction was given. Therefore, there are no findings to support Caleb's claim that he was seized or unlawfully restrained at the time of the search of the wallet. Moreover, the facts do not support a finding that Caleb was unlawfully arrested. The district court found that he was not arrested until after he gave his consent to the search and after the counterfeit money and pattern $10 bill were found in his wallet.

Assuming an instruction "not to move" was given, it would not vitiate Caleb's voluntary consent to the search. Upon entering his room, the officers could reasonably seek to briefly limit his movements. The tenor of the ensuing conversation is not one of an individual being seized or unlawfully restrained, but of an individual being asked questions and responding to those questions. Therefore, the fact that Appellant's movements may have been limited briefly is of no consequence here, as the focus is on whether there was voluntary consent. A seizure or unlawful restraint alone does not mandate a finding of coerced consent. *United States v. Burns*, 298 F.3d 523, 541 (6th Cir.2002).

Neither the record nor the district court's findings support the allegation that Agent Kling demanded to see the counterfeit bills or that the agents thoroughly searched Caleb's bedroom. The district court found that Agent Kling only "asked

[Caleb] if he know anything about possession of counterfeit currency." Memorandum at 4. In addition, neither the record nor the district court's findings support the allegation that there was a "full blown search" of Caleb's bedroom. Rather, the evidence established that Agent Kling looked in Caleb's wallet and removed the sample $10 bill and counterfeit money; the court found that Caleb himself "got out of bed and pulled back a piece of the carpet and retrieved the hidden marijuana." Memorandum at 4–5. These two limited searches simply do not amount to a full blown search as claimed and again have nothing to do with Caleb's voluntary consent.

## IV. CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's order denying the motion to suppress evidence.